UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| JEFFREY ANDERSEN, an individual, on behalf of himself and all similarly situated individuals,<br><br>                Plaintiff,<br>   vs.<br><br>BRIAD RESTAURANT GROUP, LLC,<br><br>                Defendant. | Case No.: 2:14-cv-00786-GMN-BNW<br><br>**ORDER** |

Pending before the Court is the Motion Regarding Composition of the Certified Class, (ECF No. 197), filed by Plaintiff Jeffrey Andersen ("Plaintiff"). Defendant Briad Restaurant Group, LLC ("Defendant") filed a Response, (ECF No. 202), and Plaintiff filed a Reply, (ECF No. 203). The Court held oral arguments on December 20, 2019, and permitted Defendant an opportunity to supplement the evidence it provided in opposition to Plaintiff's Motion. Defendant timely submitted its supplemental evidence. (Supp. Decl., ECF No. 206). For the reasons discussed below, Plaintiff's Motion Regarding Composition of the Certified Class is **GRANTED in part** and **DENIED in part without prejudice**.

**I.    BACKGROUND**

This case arises out of Defendant's alleged violations of Nevada's Minimum Wage Amendment, Nev. Const. art. XV, § 16 (the "MWA"). During all relevant times, Defendant owned and operated eight TGI Friday's restaurants in Nevada (collectively, the "Restaurants"). (Mot. Certify 5:14–16, ECF No. 179). Plaintiff Andersen worked as a server at one of Defendant's restaurants between July of 2009 and March of 2013. (Am. Compl. ¶ 16, ECF No. 6). Plaintiff brings this action individually and on behalf of other similarly situated employees

of the Restaurants for whom Defendant allegedly failed to offer MWA-compliant health benefits plans. (*Id.* ¶¶ 2, 36–39, 64); (Mot. Certify 5:10–12).

On September 26, 2019, the Court granted Plaintiff's Motion for Class Certification pursuant to Federal Rule of Civil Procedure 23. The Court certified the class definition as:

> All current and former employees of Defendant at its Nevada locations who were paid less than $8.25 per hour at any time since May 19, 2012, but were not provided with qualifying health benefits pursuant to Nev. Const. art. XV, sec. 16, excluding those employees who executed arbitration agreements.

Order 20:2–12, ECF No. 193). Plaintiff thereafter filed the instant Motion, (ECF No. 197), seeking to modify that definition.

## II.  LEGAL STANDARD

"A class definition should be precise, objective, and presently ascertainable." *Mazur v. eBay Inc.*, 257 F.R.D. 563, 567 (N.D. Cal. 2009) (quoting *O'Connor v. Boeing N. Am., Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998)). Moreover, "courts retain discretion to revisit class certification throughout the legal proceedings, and may rescind, modify, or amend the class definition in light of subsequent developments in the litigation." *E.g.*, *Howell v. Advantage RN, LLC*, 401 F. Supp. 3d 1078, 1085 (S.D. Cal. 2019) (citations omitted); *Luviano v. Multi Cable, Inc.*, No. CV-15-05592 BRO (FFM), 2017 WL 3017195, at *12 (C.D. Cal. Jan. 3, 2017) ("District courts have broad discretion to modify class definitions."). Any modification must still meet the requirements of Federal Rule of Civil Procedure 23. *Cf. Ms. L. v. U.S Immigration & Customs Enf't*, 330 F.R.D. 284, 287 (S.D. Cal. 2019).

## III.  DISCUSSION

Plaintiff moves to modify the class definition so that it no longer excludes Defendant's employees who signed arbitration agreements after the filing of the Complaint on May 19, 2014. (Mot. Class Comp. 2:20–23, ECF No. 197). To encompass such employees, Plaintiff proposes the following class definition:

> All current and former employees of Defendant at its Nevada locations who were paid less than $8.25 per hour at any time since May 19, 2012, but were not provided with qualifying health benefits pursuant to Nev. Const. art. XV, sec. 16, excluding those employees who executed arbitration agreements prior to May 19, 2014.

Plaintiff provides two reasons for the requested modification. First, Plaintiff claims that Defendant engaged in improper, unilateral communications with putative class members after this litigation started by requiring employees to sign arbitration agreements if they had not previously executed one. (*Id.* 2:20–3:9). This first reason for modification relies on a court's power to monitor interactions with putative class members, and remedy prejudicial actions that harm the fairness of litigation. The second reason cited by Plaintiff is the parties' Stipulation, (ECF No. 54), filed on December 18, 2014, which the Court approved on December 23, 2014. (Order Granting Stip., ECF No. 57); (Mot. Class Comp. 2:15–19). The Stipulation explained that,

> [I]n an effort to facilitate settlement in this matter, Defendant has agreed to not seek to enforce in this Litigation arbitration agreements executed subsequent to May 19, 2014 by employees who were employed prior to the filing of the Litigation, but who had not, prior to the commencement of the Litigation, executed such agreements. (Order Granting Stip. 1:22–25).

As discussed below, the Court finds that modification of the class definition is warranted. However, modification should not occur in the exact way Plaintiff requests. The Court first turns to the appropriateness of corrective measures based on Defendant's conduct, then addresses the parties' Stipulation.

**A. Corrective Measures**

"Courts routinely exercise their discretion to invalidate or refuse to enforce arbitration agreements implemented while a putative class action is pending if the agreement might interfere with members' rights." *Jimenez v. Menzies Aviation Inc*, No. 15-cv-02392-WHO,

2015 WL 4914727, at *6 (N.D. Cal. Aug. 17, 2015) (collecting cases); *cf. Degidio v. Crazy Horse Saloon & Rest. Inc*, 880 F.3d 135, 143–44 (4th Cir.), *cert. denied sub nom. Crazy Horse Saloon & Rest., Inc. v. Degidio*, 138 S. Ct. 2666 (2018); 2 McLaughlin on Class Actions § 11:1 (16th ed.) ("Courts have also used their authority to limit coercive communications to invalidate arbitration agreements rolled out after the filing of a lawsuit, reasoning that the purported agreement constituted an improper communication with putative class members."). The party seeking invalidation or refused enforcement bears the burden of providing evidence of an opposing party's improper communications with putative class members during litigation. *Cf. Guifu Li v. A Perfect Day Franchise, Inc.*, 270 F.R.D. 509, 517–18 (N.D. Cal. 2010). An order of corrective remedies based on improper communications should rely on a "clear record" alongside "specific findings that reflect a weighing of the need" for such action "and the potential interference with the rights of the parties." *See id.*; *Wang v. Chinese Daily News, Inc.*, 623 F.3d 743, 756 (9th Cir. 2010), *judgment vacated on other grounds*, 565 U.S. 801 (2011) (citing *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 101–02 (1981)).

*Balasanyan v. Nordstrom, Inc.*, serves as an example of circumstances warranting corrective remedies based on a party's improper communications with putative class members during litigation. *See Balasanyan v. Nordstrom, Inc.*, No. 10-cv-2671-JM-WMC, 2012 WL 760566 (S.D. Cal. Mar. 8, 2012). Defendant Nordstrom, Inc. contended that it had an arbitration policy in place since 2004, though the operative agreements were "rolled out" in August of 2011. *Id.* at *1. Nordstrom, Inc. then moved to compel arbitration of claims by employees who executed the August 2011 agreements. The court noted, however, that August of 2011 was "about two months after the [class] complaint was filed in state court." *Id.* The court also described how Nordstrom, Inc. "did not alert putative members of the litigation," did not provide an "opt-out" process, and "led employees to believe that they were not entering into an agreement." *Id.* at *2–4. Nordstrom, Inc.'s actions, in total, warranted invalidation of the

"rolled out" August 2011 agreements (for purposes of the case) because those actions constituted improper communications that threatened class members' rights. *Id.*

However, courts do not always invalidate or refuse enforcement of arbitration agreements when the defendant executes such agreements with putative plaintiffs during litigation. One court in this District allowed a defendant to execute arbitration agreements with employees who could be members of a collective action, even during litigation, when it was clearly consistent with a policy established "long before" litigation began. *See Cohn v. Ritz Transp., Inc.*, No. 2:11-cv-1832-JCM-NJK, 2014 WL 1577295, at *3 (D. Nev. Apr. 17, 2014) ("[I]t is clear that defendants' policy requiring that new employees sign the agreement was in place long before this action began.").

In *Cohn v. Ritz Transp., Inc.*, the defendant had an arbitration policy that began roughly a month before litigation. (Defs.' Mot. Dismiss and/or Compel Arb., *Cohn v. Ritz Transp., Inc.*, No. 2:11-cv-1832-JCM-NJK (D. Nev. Sept. 18, 2013), ECF No. 97). For those who executed arbitration agreements based on that pre-litigation policy, the defendant provided evidence that execution occurred for most of the bound employees before the case commenced. (*Id.*). Otherwise, execution occurred soon after the policy started and in a similar timeframe as others subject to the same arbitration agreements. (*Id.*) (showing the largest gap between the policy's start and the execution of agreements being roughly three months). Moreover, *Cohn* centered on employees signing arbitration agreements before opting into a collective action under the Fair Labor Standards Act; as opposed to claims involving the opt-out process for a class action pursuant to Federal Rule of Civil Procedure 23. *Cohn*, No. 2:11-cv-1832-JCM-NJK, 2014 WL 1577295, at *3, *16–17.

Here, to satisfy the initial burden of showing that Defendant engaged in improper communications with putative class members during litigation, Plaintiff provides declarations from five of Defendant's prior employees. The declarations show that, while employed with

Defendant, each employee executed a new arbitration agreement around November 25, 2014—months after Plaintiff filed the Class Action Complaint, (ECF No. 1). Plaintiff asserts that these five employees had not executed an arbitration agreement with Defendant before this litigation began, and Defendant provided no evidence to refute that assertion.

These five declarations are concerning here because they support Plaintiff's theory that Defendant rushed to execute arbitration agreements at the same time Defendant had its managers search through employees' files looking for executed agreements as proof of who could participate in this case.[1] To explain, on November 22, 2014, Bob Belmont (Briad's management representative at six Las Vegas-area TGI Fridays locations) sent an email to "GMs and Team" about needing to make copies of the signed "At Will / Arbitration agreement in every employee's files." (Email, Ex. 2 to Mot. Class Comp., ECF No. 197-2). Those copies would be sent to Jo Coutts at the "Scottsdale office"; and the deadline to do so was three days after Belmont's email (on November 25, 2014). (*Id.*). However, around this three-day window, some managers did not just send copies of previously executed agreements. They had employees execute new arbitration agreements, such as individuals employed with Defendant since 1999, 2006, 2012, and March of 2014. (Decl. Sara Estrada Quezada ¶¶ 1–3, 6, ECF No. 197-5); (Decl. Joaquin Vasquez Peralta ¶¶ 1–3, 6, ECF No. 197-6); (Decl. Guillermo Gonzalez ¶¶ 1–3, 6, ECF No. 197-7); (Decl. Cristina Venegas Alvarez ¶¶ 1–3, 6, ECF No. 197-8); (Decl. Alfredo Garcia ¶¶ 1–3, 6, ECF No. 197-9).

The five declarants also state that they were not told of the arbitration agreement's purpose; and no evidence shows they were told about this on-going litigation when asked to

---

[1] Defendant claims that collecting copies of signed arbitration agreements was an innocent practice required by Federal Rule of Civil Procedure 26(a)(A)(1)(ii). (Resp. 10:2–23). However, Rule 26 does not require execution of new arbitration agreements, especially with those who had not signed them before litigation began. Similarly, while the email itself did not request managers to execute new agreements, Defendant provides no authority for the position that it is not responsible for the actions of its managers.

sign. (Decl. Sara Estrada Quezada ¶¶ 5–8); (Decl. Joaquin Vasquez Peralta ¶¶ 5–8); (Decl. Guillermo Gonzalez ¶¶ 5–8); (Decl. Cristina Venegas Alvarez ¶¶ 5–8); (Decl. Alfredo Garcia ¶¶ 5–8). Consequently, the declarations support pressure to sign quickly, deficient explanations about the arbitration agreement's contents, lack of translation into the workers' primary language, and no explanation about opting out of this litigation.

To counter Plaintiff's evidence, Defendant contends that the five declarations should not be considered here because, since 2012 forward, each declarant made at least $10 per hour. (Decl. Jo Coutts ¶¶ 6–7, ECF No. 202-2); (Supp. Decl. Jo Coutts ¶ 5, ECF No. 206). Thus, the five employees would never have been putative class members in this litigation. Defendant adds that it had a policy since 2009 of requiring arbitration agreements as a condition of employment. (Resp. 2:3–4, ECF No. 202); (Decl. Jo Coutts ¶¶ 1–3) ("Briad's policy is to enter into Arbitration Agreements with all of its employees."). Defendant argues that no authority prevents it from following its arbitration policy just because of on-going litigation.

Addressing first the scope of Defendant's policy to execute arbitration agreements, evidence does not support the all-encompassing practice that Defendant claims to have. Defendant previously stated to the Court that employees would have signed "Employment At-Will and Arbitration Agreements" upon "*commencing* employment" with Briad. (Mot. Compel 3:6–7, ECF No. 42) (emphasis added); (Mot. Compel 3:21–22, ECF No. 104). Defendant's Supplemental Declaration confirms this time-of-hire procedure. (Supp. Decl. Jo Coutts ¶¶ 4–5) ("Briad's policy is to present employees with the agreement at or near the time of hire and then give them an opportunity to review and sign."). Defendant also declared that it "does not have a policy or practice of requiring employees who initially failed to sign arbitration agreements to do so later in employment." (*Id.* ¶ 4). Accordingly, no evidence clarifies why several of Defendant's long-standing employees were required to execute arbitration agreements around the same time of November 25, 2014. Indeed, Cristina Venegas Alvarez was employed with

Defendant since 2012, and Alfredo Garcia since March of 2014, yet both declare that they were required to sign arbitration agreements roughly six months *after* this litigation began. (Decl. Cristina Venegas Alvarez ¶¶ 3–5); (Decl. Alfredo Garcia ¶¶ 3–5); (Decl. Guillermo Gonzalez ¶¶ 5–8) (showing employment for over a decade before executing an arbitration agreement with Defendant). Were the Court to agree with Defendant based on its claimed policy—where it could sporadically force longstanding employees to sign arbitration agreements during on-going litigation, and without notifying them of such litigation, because a slight majority of employees have previously signed agreements before this case began—it would permit Defendant to employ an unrestricted, irregular process to unilaterally remove masses of putative class members from participation in this litigation.

However, what prevents the Court from finding that Plaintiff satisfied his burden of proving Defendant's improper, unilateral communications is that Defendant paid each of the five declarants more than $10 per hour since 2012. Thus, none could be class members based on wages of "less than $8.25 per hour at any time since May 19, 2012, but . . . not provided with qualifying health benefits." This renders Plaintiff's evidence critically dissimilar from *Balasanyan*, *Jimenez*, and other decisions implementing corrective measures. *See, e.g., Balasanyan*, No. 10-CV-2671-JM-WMC, 2012 WL 760566, at *4 (invalidating agreements because "Nordstrom's communication constituted an improper attempt to alter the pre-existing arbitration agreement *with putative class members* during litigation") (emphasis added); *In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d 237, 254 (S.D.N.Y. 2005) (refusing to enforce arbitration agreements after finding "defendants' unsupervised communications were improper because they sought to eliminate putative class members' rights in this litigation"); *Guifu Li*, 270 F.R.D. at 517–18; *Wang*, 623 F.3d at 756.

Moreover, aside from the five declarations, Plaintiff's remaining argument for corrective measures arises from an inference of improper actions. Plaintiff draws this inference from an

apparent increase in the number of Defendant's employees bound by arbitration agreements. (Mot. Class Comp. 4:18–5:16, ECF No. 197). Defendant previously detailed how, out of 1,799 employees "paid below the upper tier minimum wage," 957 of them were bound by arbitration agreements as of 2015. (Resp. 18:12–17, ECF No. 186). As litigation continued, Defendant reported that the total number of employees who executed arbitration agreements as of April 2016 was 1,335. (Def.'s Supp. Resp. to Req. for Produc. at 4, Ex. 1 to Mot. Class Comp., ECF No. 197-1). But the count of 1,335 does not appear specific to those who could be members of the class here. Accordingly, the apparent increase does not support a factual finding of putative class members being stripped of involvement in this matter. Nor is this increase sufficient circumstantial evidence for the Court to make a factual finding of on-going threats to the fairness of litigation. Plaintiff, consequently, does not satisfy his burden to earn the corrective measure of modifying the class definition or finding arbitration agreements unenforceable.

Nevertheless, the increase in Defendant's employees subject to an arbitration agreement could be significant, especially to challenge Defendant's declaration that it took "no action to have current employees sign arbitration agreements if they did not originally upon hire." (Supp. Decl. Jo Coutts ¶ 4). The Court is also concerned with the timing of Defendant's execution of arbitration agreements with longstanding employees during this litigation, outside of a discernible policy, and without establishing safeguards to ensure no such action occurred with putative class members. So, while the Court denies Plaintiff's Motion to the extent that it seeks corrective measures based on improper class communications, denial is without prejudice. Plaintiff may again move for corrective measures if there is evidence showing that Defendant engaged in improper, prejudicial actions during litigation which threaten the participation of putative class members. *See, e.g.*, *Jimenez*, 2015 WL 4914727, at *5 (citing *Wang*, 623 F.3d at 756) ("Corrective action is appropriate if a class communication so much as 'threatens the fairness of the litigation.'").

**B. The Parties' Stipulation**

Addressing now the parties' Stipulation, Defendant contends that this, too, does not warrant modifying the current class definition. According to Defendant, the Stipulation was "for the purpose of engaging in settlement discussions at that time only." (Resp. 2:20–24, ECF No. 202). In other words, "[t]hat agreement did not extend past the existing settlement discussions and was purely so the parties could work from agreeable data regarding possible class size." (*Id.* 2:25–27). Defendant bolsters its argument by highlighting the Stipulation's language stating, "[t]his agreement is also not a waiver of either Party's claims or defenses related to the enforceability of any arbitration agreements at issue in the Litigation." (*Id.* 2:27–28); (Order Granting Stip., 1:26–2:2). In contrast, Plaintiff argues that the parties intended the Stipulation to apply beyond settlement discussions. (Mot. Class Comp. 2:15–19). Plaintiff adds that the language about not waiving claims or defenses related to the enforceability of arbitration agreements merely concerned those agreements executed by employees who began working for Defendant *after* the filing of this lawsuit. (*Id.*).

"Because stipulations serve both judicial economy and the convenience of the parties, courts will enforce them absent indications of involuntary or uninformed consent." *CDN Inc. v. Kapes*, 197 F.3d 1256, 1258 (9th Cir. 1999). Basic contract principles control the interpretation of a stipulation. *Jeff D. v. Andrus*, 899 F.2d 753, 759 (9th Cir. 1989). Accordingly, a court begins with the plain language of a stipulation to determine its scope. *See, e.g.*, *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999).

The parties' Stipulation starts with language about its purpose, "to facilitate settlement." (Order Granting Stip. 1:26–2:2). However, the Stipulation does not state that the Stipulation is applicable only to settlement discussions. Nor does it list a termination date for the agreement or circumstances that would render it moot. Rather, it declares that Defendant would not seek enforcement of a specific set of arbitration agreements "in this Litigation"; and the specific

agreements were those "executed subsequent to May 19, 2014 by employees who were employed prior to the filing of the Litigation, but who had not, prior to the . . . Litigation, executed such agreements." (*Id.*). The Stipulation's plain terms thus express a purpose for more than upcoming, out-of-court settlement discussions.

Where the Stipulation's language appears to create some confusion is a few sentences later, where it states that neither party waives claims or defenses related to "any arbitration agreements at issue in this Litigation."[2] (*Id.* 1:26–2:2). But since the earlier language declares how Defendant would not seek to enforce a specific set of arbitration agreements, it follows that the specified arbitration agreements would no longer be "at issue" in "this Litigation." Accordingly, the plain language of the Stipulation alone, when considered as a whole, supports Plaintiff's contention that Defendant stipulated not to enforce arbitration agreements executed after May 19, 2014, by employees "who were employed prior to the filing of the Litigation, but who had not, prior to . . . the Litigation, executed such agreements."

Furthermore, Defendant filed the Stipulation with the Court. (*See* Joint Stip., ECF No. 54). It thus had a central role in drafting—or at least a final role in reviewing—the exact terms seeking approval, which makes it again noteworthy that the Stipulation does not declare itself moot if the parties failed to reach a settlement. And even if the Court had to look past the Stipulation's plain terms, Plaintiff explains a reasonable basis for interpreting the Stipulation broadly based on circumstances surrounding its creation. Specifically, on November 26, 2014, Plaintiff's counsel sent a letter to Defendant's counsel contending that "we have been made aware of your client's current efforts to impose newly-executed, purported arbitration

---

[2] In the Stipulation's second paragraph, there is another sentence giving pause about its scope. It states, "[t]his agreement does not extend to any other litigation, lawsuits, claims or actions, nor is it a waiver of any arbitration agreement." The sentence's ending language, of not waiving "any arbitration agreement," appears broad. In context, however, this ending language serves to ensure that the Stipulation did not extend to other cases or for claims not already brought in this case. It does not convince the Court that the Stipulation served only for purposes of settlement and allowed Defendant to retain any arguments about enforceability.

1 agreements upon Plaintiffs and members of the putative Class in this action." (Mot. Class
2 Comp. 6:12–15); (Pl.'s Counsel's Correspondence, Ex. 3 to Mot. Class Comp., ECF No. 197-3)
3 (dated November 26, 2014). Plaintiff promptly scheduled depositions for the executives most
4 likely involved, but rescinded the depositions a few weeks later when the parties generated the
5 Stipulation. (*Id.*); (Pl.'s Am. Not. Dep. at 2, Ex. 4 to Mot. Class Comp., ECF No. 197-4) (dated
6 Dec. 12, 2014); (Joint Stip., ECF No. 54) (dated December 18, 2014); (Mot. Class Comp. 6:3–
7 10). The Court finds it significant that Defendant now claims the Stipulation applied only for
8 settlement; when, at the time of the purportedly prejudicial actions, Plaintiff's counsel intended
9 to proceed with depositions shedding light on the exact conduct at issue. Evidence regarding
10 the parties' intent at the time they executed the Stipulation therefore supports Plaintiff's
11 interpretation. *Cf. Kemmis v. McGoldrick*, 767 F.2d 594, 597 (9th Cir. 1985) ("If a provision is
12 ambiguous, however, its interpretation depends on the parties' intent at the time of execution.").

### C. Class Definition

Based on the parties' Stipulation, the appropriate modified class definition is:

> All current and former employees of Defendant at its Nevada locations who were paid less than $8.25 per hour at any time since May 19, 2012, but were not provided with qualifying health benefits pursuant to Nev. Const. art. XV, sec. 16, excluding those employees who executed arbitration agreements unless the employee was employed with Defendant before May 19, 2014, and did not execute an arbitration agreement until after May 19, 2014.

To the extent Defendant contends that the modified definition violates Federal Rule of Civil Procedure 23's predominance requirement, the Court is not persuaded. A straightforward review of employment records would reveal who signed arbitration agreements before and after May 19, 2014, and when Defendant hired each employee. Further, the Court would not need to conduct an individualized inquiry concerning the enforceability of each arbitration agreement on its merits or formation defenses. Nor would the Court need to review the merits of each employee's claim. The corrective action would merely require identifying employees eligible

for membership in the class based on employment records.[3] The predominating common issues, as explained in the class-certifying Order, remain present. (Order, ECF No. 193).

Finally, established authority protects a party's ability to communicate with putative class members during litigation. *See Gulf Oil Co.*, 452 U.S. at 101–02. This Order neither forecloses communication nor imposes a ban requiring the Court's approval of communications between counsel and putative class members. However, either party may propose restrictions tailored to remedy on-going and prejudicial conduct if supported by an evidentiary basis.[4]

## IV.  CONCLUSION

**IT IS HEREBY ORDERED** that Plaintiff's Motion Regarding Composition of the Certified Class, (ECF No. 197), is **GRANTED in part** and **DENIED in part without prejudice**.

**DATED** this __13__ day of January, 2020.

_____
Gloria M. Navarro, District Judge
United States District Court

---

[3] This Order does not alter the Court's previous decisions compelling arbitration for certain named plaintiffs. Those decisions concerned arbitration agreements executed at the beginning of employment and before this litigation began. (Order, ECF No. 93); (Deatra Enari Arbitration Agreement, Ex. A to Mot. Compel, ECF No. 42-1) (executed on September 4, 2009); (Toby Earl Arbitration Agreement, Ex. B. to Mot. Compel, ECF No 42-2) (executed on October 10, 2012); (James Skadowski Arbitration Agreement, Ex. C. to Mot. Compel, ECF No. 42-3) (executed on December 23, 2011); (Michelle Pickthall Arbitration Agreement, Ex. D to Mot. Compel, ECF No. 43-4) (executed on September 6, 2010); (Order, ECF No. 123); (Mot. Compel 2:6–25, ECF No. 104) (citing records showing Shyheem Smith executed an arbitration agreement by electronic signature on January 18, 2014).

[4] Plaintiff argues that, if the Court does not invalidate all post-filing arbitration agreements based on improper class communications, the Court should require Defendant to do the following: produce the contact information of all employees it contends are excluded from the class; and produce "the arbitration agreement documents it relies upon" to assert the exclusion. (Reply 10:6–15, ECF No. 203). However, this argument does not explain why that information cannot be requested or gained through the current period of discovery. (*See* Scheduling Order 2:20–22, ECF No. 195) (stating this phase of discovery ends on April 7, 2020).